IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | | |
|---|---|---|
| **CHRISTINE HAUG** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: CBD-15-2035** |
| | * | |
| **A&A GAMING, LLC, et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | * | |
| | * | |
| | ***** | |

## MEMORANDUM OPINION

Before this Court is the Motion for Summary Judgment brought by Defendants Robert F. Abner and A&A Gaming, LLC (ECF No. 28) ("Defendants' Motion"), the opposition and reply thereto. The Court has reviewed Defendants' Motion, related memoranda, and applicable law. No hearing is deemed necessary. *See* Local Rule 105.6 (D. Md.). For the reasons presented below, the Court **GRANTS** Defendants' Motion.

## I.     Factual Background

Christine Haug ("Plaintiff") began working for A&A Gaming, LLC ("A&A Gaming"), an establishment located in Chesapeake Beach, Maryland, as a "cashier/bartender" on or about February 8, 2013. Compl. 3. A&A Gaming is located in the same building as the restaurant Bay Abner, Inc., also known as Abner's Crab House. Abner Dep. 5:21-7:3; O'Donnell Dep. 7:8-10. A&A Gaming employs about ten people and Bay Abner, Inc. employs about twenty five. Abner

Dep. 7:15-8:5. While working at A&A Gaming, Plaintiff's supervisors were Bonnie O'Donnell and Shawn[1] Abner ("Shawn"). Def.'s Mot. 3.

On or about March 28, 2013, while at work, Plaintiff was approached by Robert Abner, owner of both A&A Gaming and Bay Abner, Inc., and the two engaged in conversation. Compl. 3. According to Plaintiff, Mr. Abner commented on Plaintiff's body, stating that "she was slim" and asked whether "she had a drug problem like his wife because she was so slim." *Id.* at 3-4. Plaintiff alleges that Mr. Abner then whispered in Plaintiff's ear "if she would 'fill in' for his wife" while his wife was out of town. *Id.* at 4. Plaintiff then allegedly indicated to Mr. Abner that his conduct was inappropriate and unsettling, to which Mr. Abner laughed and walked away. *Id.*

A few days later, on or about March 31, 2013, while Plaintiff was outside the establishment on a smoke break, she again conversed with Mr. Abner. *Id.* at 5. According to Plaintiff, Mr. Abner stated that "'she was a smart girl, and that she would be wise to take him up on his offer to "fill in" for his wife,' and that he would 'give her whatever she wanted' and 'he would keep her happy.'" *Id.* at 6. Plaintiff alleges that Mr. Abner then grabbed the back of her head and pulled it towards him and said "that if she wanted her job, she better think about his offer 'to fill in for his wife.'" *Id.* After Plaintiff pushed Mr. Abner's arm away and walked back inside, Plaintiff claims that he followed her in and asked her how many kids she had. *Id.* at 7. Plaintiff claims that she told him that she had two children, to which Mr. Abner responded that Plaintiff "knows how to make children and that is what he wants." *Id.* Plaintiff then became distraught. *Id.*

---

[1] Plaintiff uses the spelling "Sean" in her Complaint and her Opposition to Defendants' Motion for Summary Judgment.

The next day, Plaintiff told Shawn and Ms. O'Donnell about the incident with Mr. Abner. *Id.* at 7-8. Plaintiff asked that Mr. Abner not be anywhere in the building while she was working, to which Ms. O'Donnell replied that that would not happen because Mr. Abner owned the building "but he said he is willing to apologize." *Id.* at 9. Ms. O'Donnell also expressed, according to Plaintiff, that Plaintiff should keep her mouth shut because if Mr. Abner's wife found out, "she will kick [Plaintiff's] ass." *Id.* Ms. O'Donnell then instructed Plaintiff to take a couple of days off. *Id.* Ms. O'Donnell testified that while Plaintiff was out, she kept Plaintiff's shifts open and that she "definitely wanted [Plaintiff] to come back" to work. Defs.' Mot. 6-7. Plaintiff did not return to work. *Id.* at 8.

Plaintiff filed a Complaint alleging three counts: (1) Defendants violated 42 U.S.C. § 2000e-1-17 ("Title VII") based on a "Hostile Work Environment"; (2) Defendants violated Title VII based on "*Quid Pro Quo* Sexual Harassment"; and (3) intentional infliction of emotional distress. Compl. 10-14. This Court dismissed Plaintiff's cause of action for intentional infliction of emotional distress.

Defendants filed this Motion for Summary Judgment, alleging that there is no genuine dispute of material facts and Defendants are entitled to judgment as a matter of law. Specifically, Defendants argue: (1) Plaintiff's allegations do not satisfy the requirements to establish a "hostile work environment"; (2) Plaintiff's allegation do not satisfy the requirements to establish "*quid pro quo* sexual harassment"; (3) neither named Defendant, Mr. Abner nor A&A Gaming, constitutes an "employer" for purposes of Title VII.

## II.    Standard of Review

The Court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a).

A genuine dispute exists where "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citation omitted).  When deciding summary judgment, the Court "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citation omitted).  Summary judgment is not a "disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

For the purposes of Defendants' Motion, Defendants rely on Plaintiff's version of events regarding the interactions between Plaintiff and Mr. Abner, explaining that "these disputes do not constitute disputes of material facts for purposes of a summary judgment motion[.]"  Defs.' Mot. n.1.

**III.    Analysis**

**A.  A&A Gaming constitutes an "employer" for purposes of Title VII.**

Defendants argue that neither Mr. Abner nor A&A Gaming constitute an "employer" under Title VII.  Plaintiff "concedes that Title VII does not apply to individuals and concedes that the action should be dismissed against Robert Abner in his individual capacity."  Pl.'s Opp'n 16; *see Papanicolas v. Project Execution & Control Consulting, LLC*, 151 F. Supp. 3d 628, 630 (D. Md. 2015) ("Title VII expressly does not apply to individuals, nor to entities that do not meet the applicable threshold number of employees.").  Plaintiff maintains that A&A Gaming is an employer for purposes of Title VII.

Title VII requires that an "employer" be defined as one who is "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C.A. § 2000e(b). An employer with fewer than fifteen employees "does not satisfy Title VII's statutory definition of employer and, therefore, is not subject to discrimination actions founded on Title VII." *Tasciyan v. Med. Numerics*, 820 F. Supp. 2d 664, 671 (D. Md. 2011) (citation omitted). "[T]he threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

Defendants argue that because A&A Gaming employs less than fifteen people, it does not meet the definition of "employer" under Title VII. Plaintiff alleges that A&A Gaming meets the qualifications for "employer" because A&A Gaming and Bay Abner, Inc., both owned by Mr. Abner, constitute a single employer under the "integrated employer test." Pl.'s Opp'n 14. The "integrated-employer test" seeks to determine whether two separate entities can be considered a "single employer" for Title VII purposes because they are "so interrelated that they constitute a single employer." *Jarallah v. Thompson*, 123 F. Supp. 3d 719, 729 (D. Md. 2015), *aff'd*, 627 F. App'x 185 (4th Cir. 2015) (citations omitted). The integrated-employer test requires: "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." *Id.* (citations omitted).

> In deciding the common management element, courts look to whether the separate corporations share a common manager who runs day-to-day operations and has the authority to hire and fire employees. *See Hukill* [*v. Auto Care, Inc.*]*, 192 F.3d [437,] 443 [4th Cir. 1999)]; *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 392 (8th Cir. 1977) (finding common management and ownership where the same individual was president of both corporations and ran day-to-day operations). The second element—interrelation between operations—can also be shown through evidence of a common manager who runs day-to-day operations and through employee transfers between locations. *See Hukill* 192 F.3d at 443. The third factor—control of labor operations—is shown when a single party controls

5

> employment decisions across multiple corporations. *See id.* at 444 (finding no
> centralized control of labor relations when the company had "no power to hire,
> fire, or supervise employees" at the allegedly related companies). Employment
> decisions include the power to hire, fire, supervise, and set employee schedules.
> *Id.* The last element—common ownership—is shown when one individual owns
> and has financial control over the different enterprises. *See Watson* [*v. CSA, Ltd.*]*,*
> 376 F. Supp. 2d [588,] 598 [(D. Md. 2005)].

*Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 603 (D. Md. 2014) (citations omitted). This is a

"fact-intensive inquiry." *Id.* at 602 (citations omitted).

Mr. Abner is sole owner, along with his wife, of Bay Abner, Inc., and he owns fifty-five

percent of A&A Gaming, and his son owns the rest. Abner Dep. 7:8-14. A&A Gaming and Bay

Abner, Inc. are both located in the same building. Abner Dep. 6:2-20. However, the two

businesses have

> separate tax identification numbers, (Ex. 2, Abner Depo., at 50), maintain separate
> bank accounts, (Ex. 2, Abner Depo., at 10), and the proceeds from the two
> business[es] are kept separate and apart. (Ex. 2, Abner Depo., at 11).

Defs.' Mot. 27. Although Defendants allege that A&A Gaming and Bay Abner, Inc. have

separate management,[2] Ms. O'Donnell testified that she was general manager of both "Abner's

Crab House and the game room." O'Donnell Dep. 7:8-9). She testified that as general manager,

she had "approximately 30" employees under her supervision, counting both A&A Gaming and

Bay Abner, Inc. O'Donnell Dep. 6:21; 7:8-9.

Applying the limited record before the Court to the integrated-employer test, it appears

that A&A Gaming and Bay Abner, Inc. are a single employer. They have at least one common

---

[2] Defendants provide that A&A Gaming was

> managed by Shawn Abner, Bonnie O'Donnell, and Keidra Tyler. (Ex. 2, Abner
> Depo., at 35). By contrast, Bay Abner, Inc. is managed by David Fulk, Robert
> Abner, Jr. (the defendant's son), and Michelle McWilliams. (Ex. 2,
> Abner[]Depo., at 35). Managers for A&A Gaming, LLC do not manage
> employees of the restaurant. (Ex. 2, Abner Depo., at 35).

Defs.' Mot. 27.

manager: Ms. O'Donnell; they appear to have interrelation between operations through Ms.

O'Donnell, *see Gilbert*, 32 F. Supp. 3d at 603 ("[I]nterrelation between operations . . . can . . . be

shown through evidence of a common manager who runs day-to-day operations[.]"); they have at

least some common control of labor operations through Ms. O'Donnell, meaning control of

employment decisions including "the power to hire, fire, supervise, and set employee schedules,"

*id.*; and are both owned, whether wholly or in part, by Mr. Abner.  *Id.* ("[C]ommon ownership

. . . is shown when one individual owns and has financial control over the different enterprises).

If Plaintiff has not definitively shown that A&A Gaming and Bay Abner, Inc. are a

"single employer" through the "integrated-employer test," she has at least submitted enough to

create a question of fact on the issue.  Thus, the Court proceeds with the analysis as though

Defendants satisfy the definition of "employer" as required by Title VII.

### B.  Plaintiff's sexual harassment claim fails to meet the requirements of Title VII.

Title VII provides that it is unlawful for an employer to discriminate on the basis of sex.

42 U.S.C. § 2000e-2.  It states that an employer cannot "fail or refuse to hire or to discharge . . .

or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . sex[.]"  *Id.*  Sexual

harassment is a form of prohibited sex discrimination, and generally falls into one or both of two

categories: "(1) *quid pro quo* harassment, where sexual consideration is demanded in exchange

for job benefits; and (2) harassment that creates an offensive or hostile work environment."

*Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 390 (D. Md. 2010) (citations

omitted).

However, "[n]ot all sexual harassment that is directed at an individual because of his or

her sex is actionable.  Title VII does not attempt 'to purge the workplace of vulgarity.'"  *Hopkins*

*v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (citing *Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)); see also Hartsell v. Duplex Prod., Inc.,* 123 F.3d 766, 773 (4th Cir. 1997) (citations omitted) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.").

**1.      Plaintiff's allegations to do not amount to a hostile work environment.**

To establish a claim under Title VII on the basis of a hostile work environment, a plaintiff alleging sexual harassment in the workplace "must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 331 (4th Cir. 2003) (citation omitted).  In order to amount to a change in terms and condition of employment, the Court requires that the alleged conduct "be extreme" so "that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).  The conduct must also "be both objectively and subjectively offensive," in that (1) "a reasonable person would find [the work environment] hostile or abusive," and (2) "one that the victim in fact did perceive to be so." *Id.* at 787 (citing *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21-22 (1993).

"'Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (quoting *E.E.O.C. v. R & R Ventures,* 244 F.3d 334, 338 (4th Cir. 2001).  "A hostile work environment is one 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris*, 510 U.S. at 21).

8

This is typically a "high bar" for plaintiffs because they must show that the alleged conduct was beyond "rude treatment," but that it created a work environment that was "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (citations and quotations omitted). "In this jurisdiction there is a high burden of proof required to make out a sufficient hostile work environment claim." *Moret v. Geren*, 494 F. Supp. 2d 329, 341 (D. Md. 2007) (citations omitted). Defendants argue that Mr. Abner's conduct was not "sufficiently severe or pervasive," as required by the third element outlined in *Ocheltree*, to create an abusive work environment. Defs.' Mot. 11. The Court agrees that Plaintiff has not met "the high burden of proof" required to show that Mr. Abner's actions were severe or pervasive. *See Moret*, 494 F. Supp. 2d at 341.

Over the years, this Circuit and District have produced a large amount of case law that have established a base line, or an "objective standard," of the type of behavior that does or does not satisfy the "severe" or "pervasive" requirement for a hostile work environment. *Id.* at 342. In many of those cases, courts have granted or affirmed the granting of summary judgment in instances of harassment that could be deemed more egregious than the facts alleged here because the plaintiffs in those cases failed to satisfy the severe and pervasive element.

In *Naylor v. City of Bowie*, 78 F. Supp. 2d 469, 477 (D. Md. 1999), this Court determined that about twenty-four ongoing incidents for a period of about a year, including statements made by the defendant to the plaintiff suggesting "he 'wouldn't mind' getting 'into [the plaintiff's] pants' and when he left a condom underneath a box of candies which he gave to her . . . did not rise to the level of being sufficiently severe and pervasive to create an objectively hostile or abusive work environment." The Court explained that "[u]ndoubtedly, plaintiff subjectively

found [defendant]'s conduct to be annoying and offensive.  But much more must be proved to satisfy the Title VII requirement that the conduct in question, when viewed objectively, amounted to sexual harassment." *Id.* at 477.

In another case, *Moret v. Geren*, 494 F. Supp. 2d at 342, the Court granted defendant's motion for summary judgment where the plaintiff claimed that the defendant

> sexually propositioned her while discussing her salary and benefits[]; requested that she massage his nude buttocks[]; asked if she had strong fingers[]; forced her to speak on the phone with his son[]; suggested that she date his son[]; and routinely leered at her, made comments about her appearance, and made comments about her make-up.

The Court determined that these multiple incidents did not satisfy the "severe and pervasive requirement" and thus did not amount to a hostile work environment.  *Id*.

Even when a plaintiff has claimed that her "supervisor asked her to close his office door and remove all of her clothing" and "remarked that a woman's film which she intended to show was stupid," as was the case in *Boarman v. Sullivan*, 769 F. Supp. 904, 910 (D. Md. 1991), this Court has held that such incidents together do "not amount to an abusive working environment." In *Boarman*, the Court relied on *Raley v. Board of St. Mary's County Comm'rs*, 752 F. Supp. 1272 (D. Md. 1990), where the

> Court dismissed plaintiff's hostile work environment claim after finding that she had not made out the third prong of her *prima facie* case.  In [*Raley*], plaintiff's supervisor had offensively touched plaintiff on two occasions, had made sexual remarks to plaintiff and had been seen by plaintiff kissing and touching other women in the office.  In *Raley,* this Court found that *the incidents in question were isolated and did not rise to the level of an abusive working environment*.

*Id.* (emphasis added); *see also Francis v. Bd. of Sch. Comm'rs of Baltimore City*, 32 F. Supp. 2d 316, 320 (D. Md. 1999) (granting the defendant's motion for summary judgment after concluding that the incidents alleged were insufficiently severe or pervasive, where the plaintiff claimed that the defendant (1) requested sexual favors from

her in return for a promotion to the permanent position; (2) accused her of having a sexual relationship with her former supervisor; (3) commented on the plaintiff's body; and (4) squeezed the plaintiff's waist); *Singleton v. Dep't of Corr. Educ.,* 115 Fed. App'x 119, 122 (4th Cir. 2004) (finding that "allegations that [the defendant] made offensive comments, showed [the plaintiff] unwanted attention that made her uncomfortable, and continuously expressed a sexual interest in her do not meet the high standard [for establishing severe and pervasive sexual harassment]").

Where the Court has found a hostile work environment, the defendants' conduct has been particularly offensive.  In *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011), the Fourth Circuit reversed the District Court's grant of summary judgment, finding that the plaintiff presented "a strong claim for hostile work environment."  The Court explained that the plaintiff "suffered upward of twelve (12) incidents in just four months . . . [that] span fondling, kissing, propositioning, describing sexual activities, and asking intimate questions."  *Id.*  Another Fourth Circuit case, *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d at 205, reversed the District Court's grant of summary judgment, where the plaintiff alleged that she endured "inappropriate sex-based comments to her and other co-workers on a near-daily basis," including remarks about her giving oral sex and the accused grabbing his crotch and saying to the plaintiff, "these nuts are looking for you."

Seen through the lenses of the prior case law, the two encounters Plaintiff complains of, on March 28, 2013, when Mr. Abner asked Plaintiff to "fill in for his wife," and March 31, 2013, when he again proposition her and told her "it would be in her best interests" to take him up on his offer, were "isolated" incidents.  Although Mr. Abner

grabbed Plaintiff by her head without her permission, the act was not sexual in nature.  In

fact, this Court has found that even when the accused has grabbed a plaintiff by the waist,

among other things, such actions do not amount to "severe or pervasive."  *Francis*, 32 F.

Supp. 2d at 324.  Mr. Abner's sexual remarks towards Plaintiff are closer to the actions of

the defendants in *Naylor* and *Boarman*: they are inappropriate and offensive, but do not

rise to the level of sexual harassment required under Title VII.  *Naylor*, 78 F. Supp. 2d at

477; *Boarman*, 769 F. Supp. at 910; *see also Raley*, 752 F. Supp. at 1280 (finding that

while the plaintiff was subjected to "harassment," the two "touchings" done by the

defendant to the plaintiff, including placing his hand on her thigh underneath her dress,

were "isolated incidents" and not "severe and pervasive").  Unlike the persistent,

ongoing, and graphic conduct in *Okoli* and *Walker*, here, Mr. Abner's actions do not

amount to "severe or pervasive" behavior to create a hostile working environment.

### 2. Plaintiff's allegations do not constitute *Quid Pro Quo* sexual harassment.

Sexual harassment is of the "*quid pro quo* variety" when "a supervisor explicitly makes

submission to his or her unwelcome sexual advances a condition of employment, or where the

rejection of such advances is . . . the motivation underlying an employer's decision to take an

adverse employment action against an employee."  *Pitter*, 735 F. Supp. 2d at 390 (citations and

internal quotations omitted).  To establish a *prima facie* case, the plaintiff must show that:

> (1) she belongs to a protected group; (2) she was subject to unwelcome sexual
> harassment; (3) the harassment complained of was based upon sex; (4) her
> reaction to the harassment affected tangible aspects of compensation, terms,
> conditions, or privileges of employment; and (5) the employer knew or should
> have known of the harassment and took no effective remedial action.

*Id.*

   *a.  Plaintiff fails to establish constructive discharge.*

   To satisfy the fourth element of a *prima facie* case of *quid pro quo* sexual harassment, a plaintiff must show that "a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 416 (D. Md. 2015) (citation and internal quotations omitted).  Tangible employment action can include "discharge, demotion, or undesirable reassignment." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001) (citations omitted).  A plaintiff can also recover under the theory of "constructive discharge" if the plaintiff show that "his or her *employer deliberately* ma[de] an employee's working conditions intolerable and thereby force[d] him to quit his job." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1350 (4th Cir. 1995) (citation and internal quotations omitted) (emphasis in original).  "An employer's actions are deliberate only if they 'were intended by the employer as an effort to force the plaintiff to quit.'" *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (quoting *Matvia,* 259 F.3d at 272).  The Court applies "the objective perspective of a reasonable person" to determine whether an employment environment is intolerable.  *Id.* (citing *Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004)).

   Plaintiff concedes that she was never fired or removed from her position as a result of her exchanges with Mr. Abner.  Haug Dep. 148:7-22.  Instead, she alleges that she was constructively discharged from A&A Gaming because she was subject to harassment by Mr. Abner and also had "demands placed on her by . . . Bonnie [O'Donnell] . . . and [Shawn Abner]," allegedly leaving her with no option but to quit her job.  Pl.'s Opp'n. 13-14.  The Court disagrees with Plaintiff.  There is no evidence that Defendants made Plaintiff's working conditions so

intolerable in a "deliberate" effort to "induce" her to quit. *See Matvia*, 259 F.3d at 272 ("Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit."). Rather, as Defendants point out, "repeated efforts were taken to preserve [Plaintiff's] job." Defs.' Mot. 21. Ms. O'Donnell, Plaintiff's manager at A&A Gaming, testified that after Plaintiff left on April 1, 2013, she called Plaintiff to "see how she was doing" and "to see if she wanted to come back to work." O'Donnell Dep. 18:1-5. Ms. O'Donnell expressed that she "definitely wanted [Plaintiff] to come back" to work and that she "was keeping [Plaintiff's] shifts open because [Plaintiff] needed the money." *Id.* at 20:12. She communicated this to Plaintiff, *id.*, and according to Ms. O'Donnell, Plaintiff "definitely knew that [Ms. O'Donnell] was keeping her shifts open for when she felt she was ready and able to jump back in." *Id.* at 56:12-14. Ms. O'Donnell testified that Plaintiff told her that "she wanted to come back to work [on Thursday], but then when [Ms. O'Donnell] contacted her on Thursday, [Plaintiff] said she wasn't ready. After then [sic][Ms. O'Donnell] received a paper stating [she] wasn't allowed to contact [Plaintiff] anymore, and after that there was no contact." *Id.* at 18:9-13.

As Ms. O'Donnell's testimony indicates, there was no "deliberate" effort from the Defendants to "induce" Plaintiff to quit her job. Efforts were in fact made to keep Plaintiff in her position at A&A Gaming. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("A constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1133 (4th Cir. 1995) ("[F]or a constructive discharge claim the employer must intend for the employee to quit.") (Citations and internal quotations omitted).

14

That Plaintiff herself, subjectively, felt the job intolerable and chose not to return is not enough to satisfy the fourth element of a *quid pro quo* claim under Title VII.

> b. *Any "unfulfilled threats" made to Plaintiff are treated as factors in a hostile work environment claim.*

When a plaintiff alleges sexual harassment under Title VII that involves "unfulfilled threats," that claim "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998); *see also Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 468 (W.D.N.Y. 2005) (explaining that "claims involving an unfulfilled threat of adverse employment action should be analyzed, not as *quid pro quo* claims, but as hostile work environment claims (citation omitted)). Thus, even where a plaintiff's job is threatened, such threats alone are not enough to constitute *quid pro quo* sexual harassment without any adverse employment action.

To support her *quid pro quo* claim, Plaintiff points to Mr. Abner's alleged statements "that if she wanted her job, she better think about his offer 'to fill in for his wife.'" Compl. 13. She alleges that "[s]ubmission to Defendant Abner's sexual harassment was a condition of the Plaintiff keeping her job with A&A and Abner's Crab [H]ouse." *Id.* However, Plaintiff admitted that no adverse employment action was taken against her after the incident with Mr. Abner. Plaintiff testified, "I was not fired . . . No one has threatened to fire me for making a complaint . . . I decided I wasn't going back . . . ." Haug Dep. 148:13-22; 149:3-4. Accordingly, any statements made by Mr. Abner to Plaintiff regarding her job security were "unfulfilled threats" because they never resulted in Plaintiff being removed from her job. Under *Ellerth*, these comments do not amount to *quid pro quo* sexual harassment.

15

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment.


November 7, 2016                                        _____/s/_____
                                                       Charles B. Day
                                                       United States Magistrate Judge


CBD/xl